UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROGER J. WISE,<br><br>          Plaintiff,<br><br>   v.<br><br>KOOTENAI COUNTY, IDAHO, a political subdivision of the State of Idaho; ROCKY J. WATSON, Kootenai County Sheriff; KOOTENAI COUNTY SHERIFF OFFICERS J. McAVOY, D. DUNKIN; and JOHN DOES I-V,<br><br>          Defendants. | Case No. 2:11-cv-00472-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Before the Court is Defendants' Motion for Summary Judgment. (Dkt. 35.) Plaintiff Roger Wise instituted this civil rights action under 42 U.S.C. § 1983 against Kootenai County, Sheriff Rocky Watson, Deputy Jack McAvoy, and Deputy David Dunkin, alleging that the defendants violated his constitutional rights during an arrest following an attempted traffic stop on October 19, 2009. Plaintiff alleges violations of the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, but the gravamen of his complaint is that the Deputies' use of a taser in both "dart mode" and

**ORDER - 1**

"drive-stun mode" during the arrest constituted excessive force under the Fourth Amendment.

In their motion for summary judgment, Defendants argue that no genuine dispute exists concerning whether the Deputies used excessive force during the arrest. Alternatively, Defendants argue that, even if the Court were to find a constitutional violation, the Deputies are entitled to qualified immunity and that all of Plaintiff's claims should therefore be dismissed. The parties presented oral arguments on the motion on April 16, 2013. For the reasons set forth below, the Court finds that the Deputies are entitled to qualified immunity and that Plaintiff's additional claims should be dismissed. Defendants' motion for summary judgment will be granted.

## BACKGROUND

The following facts are undisputed unless otherwise indicated. It is also worth noting at the outset that Deputy McAvoy's patrol car camera was activated during the incident and Defendants submitted the video in support of their motion.

On the afternoon of October 19, 2009, Deputy McAvoy was working as an on-duty patrol deputy for the Kootenai County Sheriff's Department when he observed Plaintiff driving 35 to 40 miles per hour in a 25 mile-an-hour zone on 19th Street in Coeur d'Alene, Idaho. Deputy McAvoy pulled his vehicle behind Plaintiff's vehicle and activated his overhead emergency lights. When Plaintiff failed to yield, Deputy McAvoy activated his siren. Plaintiff again failed to yield and continued to his residence located on 17th Street.

**ORDER - 2**

When Plaintiff reached his driveway, he and Deputy McAvoy both got out of their vehicles and Deputy McAvoy asked Plaintiff why he did not immediately pull over. Plaintiff indicated that he was not far from his residence when Deputy McAvoy attempted to initiate the stop. Deputy McAvoy informed Plaintiff that he was being pulled over for speeding. Plaintiff disputed the allegation and became visibly agitated and confrontational. Deputy McAvoy asked Plaintiff for his licence and other information, and ordered Plaintiff to return to and remain seated in his car. Plaintiff retrieved his information but refused to stay seated in his vehicle.

Deputy McAvoy again ordered Plaintiff to sit in his car, telling Plaintiff: "I'm requesting that you sit in your car so I can do my job and do it safely, because right now you're angry enough that I don't feel safe to go in my car and do my job." (*Aff. of McAvoy Ex. B*, 17:07:00.) Plaintiff refused to return to his car, indicating that he did not have to because he was on his own property. Deputy McAvoy then called dispatch and requested back-up. While Deputy McAvoy waited for back-up, Plaintiff remained outside of his car, pacing around the vehicle and the driveway in an agitated manner and continued to argue with Deputy McAvoy.

After several minutes of standing in his driveway, Plaintiff indicated that he was going to enter his house and walked toward his open garage. Deputy McAvoy warned Plaintiff not to enter the garage. When Plaintiff proceeded into his garage, Deputy McAvoy took hold of Plaintiff by his jacket and placed him against the hood of Plaintiff's car, telling Plaintiff to put his hands behind his back and that he was under arrest and

**ORDER - 3**

going to jail. Plaintiff protested and began to struggle. Deputy McAvoy then contacted

dispatch for immediate assistance. Shortly thereafter, Deputy Dunkin arrived on the scene

and attempted to assist Deputy McAvoy with handcuffing Plaintiff.

The above facts are largely visible on the video or can be confirmed through the

audio on the DVD.[1]

While the Deputies attempted to place Plaintiff in handcuffs, Plaintiff broke free of

the Deputies' hold and ran into his garage toward the door to his residence. Deputy

Dunkin removed his TASER X26 from his belt and deployed his taser in dart mode,

striking Plaintiff in his lower back. Deputy Dunkin's use of his taser and the affect it had

on Plaintiff cannot be seen on the video. The Deputies have both submitted affidavits

claiming that the taser did not work as intended and Plaintiff continued toward the door of

his residence. Plaintiff disputes this, submitting an affidavit of his own, indicating that

"when the taser dart hit me, I was knocked to the ground and I was laying on my back in

severe pain and incapacitat[ed] while the taser was cycled at least twice." (Dkt. 40-1.)

Plaintiff's pleas to the Deputies to stop cycling the taser can be heard on the video. It is

undisputed that while Plaintiff was on the ground–after being hit by the taser in dart

mode–Deputy Dunkin used his taser in drive-stun mode on Plaintiff at least twice.

---

[1] The audio on the DVD temporarily shuts off at 17:11:07, which is shortly after
Deputy McAvoy stops Plaintiff from entering his garage but before Deputy Dunkin
arrives at the scene. Deputy Dunkin can be seen arriving at the scene at 17:12:35 on the
DVD and the audio is restored at 17:12:43. Plaintiff has not challenged the accuracy of
the DVD and he did not take issue with the missing audio.

**ORDER - 4**

Plaintiff was handcuffed, brought back to the patrol car–which can be seen on the video–and the Deputies took photographs of where the taser prong struck Plaintiff. Plaintiff was arrested for Resisting and Obstructing an Officer under Idaho Code § 18-705.

Plaintiff filed a pro se complaint on October 6, 2011. (Dkt. 1.) Plaintiff thereafter retained counsel, (*Notice of Appearance by Larry Purviance*, Dkt. 20), and moved the Court for leave to file an amended complaint, (Dkt. 21), which was granted on April 6, 2012. (Dkt. 23.) On January 25, 2013, Defendants moved the Court for summary judgment on all of Plaintiff's claims. (Dkt. 35.) The Court heard oral arguments on the motion on April 16, 2013, and the motion is ripe for adjudication.

## DISCUSSION

Defendants contend that they are entitled to summary judgment on all of Plaintiff's claims as a matter of substantive law. They also, however, raise a procedural argument concerning the timing of Plaintiff's response to the motion for summary judgment. Defendants filed their motion for summary judgment on January 25, 2013. (Dkt. 33.) Plaintiff's response to the motion was due on or before February 19, 2013, but Plaintiff did not file a response until March 12, 2013–twenty-one days after the deadline. The extra time taken to file the brief apparently was not used to work on the brief itself: the materials filed consist of a three-page brief and a short affidavit submitted by Mr. Wise. Not only is the brief exceedingly short, it fails to address all of Defendants' arguments. Moreover, the argument it does address (qualified immunity) is incomplete, which will be

ORDER - 5

discussed further below.[2]

Plaintiff did not seek an extension of time or a stipulation with opposing counsel, and Plaintiff offered no explanation for the late filing in the response brief itself.[3] Based on the tardiness of Plaintiff's response, Defendants request that the Court disregard the response and accompanying affidavit based upon the Court's broad discretion in supervising litigation and Fed. R. Civ. P. 16. Because the Court finds that the Deputies are entitled to qualified immunity and Plaintiff's other claims should be dismissed, the Court need not rule on this issue.

**1.      Summary Judgment Standard**

Under Fed. R. Civ. P. 56, "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought [and] [t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[4]

---

[2] The Court's characterization of Plaintiff's Response is not meant to demean or belittle Plaintiff or his counsel. However, the way in which Plaintiff's counsel has gone about opposing Defendants' motion for summary judgment in this case falls below the standards the Court expects to see from the federal bar in this jurisdiction.

[3] At the hearing on Defendants' motion, the Court asked Plaintiff's counsel for an explanation of why the response was filed more than twenty days late and without requesting an extension of time from the Court. Plaintiff's counsel offered an apology to the Court and explained that the filing deadline had been "mis-calendared."

[4] Defendants cite to Fed. R. Civ. P. 56(c) as the basis for their motion and quote the language from that provision. However, Rule 56 was amended in 2010, and that particular provision no longer exists although the substance of the rule remains the same.

ORDER - 6

It is well established that the purpose of summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The rule, however, is not a "procedural shortcut," but a "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, . . . affidavits or declarations, . . . or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1)(A) and (B).

In evaluating whether the moving party has met this burden, the court must view the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must not make credibility findings, *id.*, and direct testimony of the non-movant must be believed, however implausible. *Leslie v. Group ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the court is not

---

*See* Fed. R. Civ. P. 56, Advisory Committee Notes, 2010 Amendment ("Rule 56 is revised to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged.").

**ORDER - 7**

required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

If the moving party satisfies its initial burden, the burden shifts to the non-moving party to produce specific evidence to demonstrate the existence of a "genuine issue for trial." *Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Liberty Lobby, Inc.*, 477 U.S. at 247-48. There must be a genuine dispute as to any material fact – a fact "that may affect the outcome of the case." *Id.* at 248. In determining whether a fact is material, the court is required to determine what facts under the substantive claim are necessary to sustain the cause of action. *Id.*

## 2. Qualified Immunity

The qualified immunity analysis necessarily encompasses the question of whether the Deputies used excessive force in this case and acts as a natural starting point for the Court's legal discussion. Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The purpose of qualified immunity is to strike a balance between the competing 'need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties

ORDER - 8

reasonably.'" *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (quoting *Pearson*, 555 U.S. at 231).

In determining whether an officer is entitled to qualified immunity, the Court employs a two-step test: first, asking whether the officer violated a plaintiff's constitutional right; if the answer to that inquiry is "yes," the Court proceeds to determine whether the constitutional right was "clearly established in light of the specific context of the case" at the time of the events in question. *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009). Although the United States Supreme Court has instructed the lower courts that they have discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first, *see Pearson*, 555 U.S. at 236, the Court sees no reason to take them out of order in this particular case. Both prongs will be discussed below.

### A.    Excessive Force

#### 1.    *Preliminary matter on case law*

Defendants rely heavily on the decisions of the United States Court of Appeals for the Ninth Circuit in *Brooks v. City of Seattle*, 599 F.3d 1018 (9th Cir. 2010) and *Mattos v. Agarano*, 590 F.3d 1082 (9th Cir. 2010). In *Brooks*, the Court of Appeals held that the application of a taser in drive-stun mode three times within a short period of time on a pregnant woman during a traffic stop *did not* constitute excessive force. *Brooks*, 599 F.3d at 1030-31. Similarly, in *Mattos*, the Court of Appeals held that the use of a taser in dart-mode against a woman at the scene of a domestic violence call, who was situated at the front door of her home between her intoxicated husband and the officers–and was

ORDER - 9

attempting to defuse the situation– *did not* constitute excessive force. *Mattos*, 590 F.3d at 1089.

As Plaintiff accurately points out in his opposition to Defendants' motion for summary judgment, the above cases were consolidated and re-heard en banc and the panel decisions were vacated. *See Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (hereinafter *Brooks/Mattos*). In the resulting en banc opinion, the Court of Appeals held that both women had sufficiently alleged constitutional violations but that the officers in both cases were entitled to qualified immunity because the law concerning the use of tasers in excessive force cases was not clearly established at the time of the incidents. *Id.* at 436. The *Brooks/Mattos* en banc decision is now the leading authority on excessive force cases involving tasers in the Ninth Circuit.[5]

## 2.    *Legal standard for excessive force cases*

The United States Supreme Court has recognized that the right to employ "some degree of physical coercion or threat thereof" to effect an arrest accompanies the authority to make the arrest. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The amount of force, however must be reasonable. *Id.* Excessive force claims are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Id.* at 388. This inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at

---

[5] At the hearing, Defendants' counsel acknowledged that the en banc decision superceded the two earlier decisions.

396.

In determining whether law enforcement officers used excessive and, therefore, constitutionally unreasonable force during the course of an arrest, the Court is guided by the factors set forth by the United States Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). Under *Graham*, the Court first considers the nature and quality of the alleged intrusion, assessing the quantum of force used to effectuate the arrest. *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001). The Court then "consider[s] the governmental interests at stake by looking at (1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Brooks/Mattos*, 661 F.3d at 441. "These factors, however, are not exclusive." *Id.* The Court must consider the totality of the circumstances and "consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Id.* (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).

When assessing an excessive force claim, summary judgment is appropriate if the court "concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under all circumstances." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). In *Graham*, the Supreme Court made clear that the reasonableness of the force used must be judged from the perspective of a reasonable officer on the scene, making allowances for the split-second judgments officers are required to make in "tense, uncertain, and rapidly-evolving" situations. 490

ORDER - 11

U.S. at 396-97.  In other words, the court must evaluate an officer's actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*, at 396. Officers are not required to use the least intrusive means available; they must act within the range of reasonable conduct.

3.    *Application of the* Graham *Factors*

The excessive force analysis begins with an assessment of the quantum of force used to effectuate the arrest. *Deorle*, 272 F.3d at 1279. The Court assesses the quantum of force "by considering the type and amount of force inflicted." *Id.* (citation and quotation marks omitted). Here, it is undisputed that Deputy Dunkin used his taser on Plaintiff in both dart and drive-stun mode. In his affidavit, Deputy Dunkin states the following concerning his understanding of the nature and effect of his taser:

> Application and use of a taser is taught as a method of control and pain compliance. When used in "dart" mode, the TASER X26 deploys two small probes that are attached to the taser by insulated conductive wires. The taser transmits an electrical current for approximately five (5) seconds, the normal cycle for the TASER X26, that causes sensory and motor dysfunction to achieve incapacitation or compliance. The taser is used in dart mode as an additional use of force option to gain compliance from resistant or aggressive persons.
>
> When used in the "drive-stun" mode, the taser is applied directly to the body of the person and inflicts only temporary and localized pain. When the TASER X26 is activated in the drive-stun mode, the taser uses electrical impulses to cause stimulation of the sensory and motor nerves. This stimulation causes strong muscle contractions, causing the muscles to first contract, then relax, producing temporary incapacitation. The use of the taser in drive-stun

**ORDER - 12**

> mode allows officers to quickly gain control of a resistive
> suspect through temporary pain compliance without long-
> lasting physical effects or injuries.

(*Aff. of Dunkin* ¶¶ 18, 19, Dkt. 35-3.)

In *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010), the Ninth Circuit addressed

the use of force involved when a taser is deployed in dart mode. The Court of Appeals

explained that, in dart mode, the taser

> uses compressed nitrogen to propel a pair of "probes" –
> aluminum darts tipped with stainless steel barbs connected to
> the [taser] by insulated wires – toward the target at a rate of
> over 160 feet per second. Upon striking a person, the [taser]
> delivers a 1200 volt, low ampere electrical charge . . . The
> electrical impulse instantly overrides the victim's central
> nervous system, paralyzing the muscles throughout the body,
> rendering the target limp and helpless.

*Bryan*, 630 F.3d at 824. The court held that the taser used in dart mode "constitutes an

intermediate, significant level of force that must be justified by the governmental interest

involved." *Id.* at 826.

The Ninth Circuit initially held in the *Brooks* case that the use of a taser in drive-

stun mode constitutes a "less than intermediate" amount of force. *Brooks*, 599 F.3d at

1028. However, when the Ninth Circuit re-heard the case en banc, the full court decided

that "the record [was] not sufficient for [the court] to determine what level of force is

used when a taser is deployed in drive-stun mode." *Brooks/Mattos*, 661 F.3d at 443. The

Court further held that it need not decide the issue, because, given the information the

court had concerning the taser–that it caused extreme pain, etc.–the court could assess

**ORDER - 13**

whether its use was excessive under the circumstances. Ultimately, the court of appeals held that the use of a taser in drive-stun mode three times in rapid succession on a pregnant woman during a traffic stop was excessive. *Id.*

Based on the Ninth Circuit's en banc decision in *Brooks/Mattos*, the Court can conclude that the use of the taser in dart mode in this case constituted an intermediate, significant level of force. Moreover, like the Ninth Circuit, this Court need not quantify the level of force concerning the use of the taser in drive-stun mode. It is clear from Deputy Dunkin's affidavit that the taser used in drive-stun mode causes pain and is used to compel compliance. Given this information, the Court can assess whether the use of the taser in drive-stun mode was excessive.

Moving to the *Graham* factors, the Court considers (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Deorle*, 272 F.3d at 1279-80.

Concerning the severity of the crime, Deputy McAvoy initially attempted to stop Plaintiff for a minor speeding infraction. However, once Plaintiff reached his driveway and finally stopped his vehicle, the undisputed facts indicate that the situation quickly escalated. Plaintiff was asked to remain in his car while Deputy McAvoy ran his registration information. Plaintiff refused and was openly hostile towards the officer. Plaintiff then walked into his garage, ignoring Deputy McAvoy's command not to do so, and when Deputy McAvoy physically retrieved Plaintiff from the garage, Plaintiff

**ORDER - 14**

actively resisted. Deputy McAvoy's use of force in bringing Plaintiff out of his garage and back to the car was certainly reasonable. Plaintiff was ultimately charged with Resisting and Obstructing an Officer under Idaho Code § 18-705. Thus, although the initial stop was for a minor traffic infraction, the crime at issue for the purposes of the *Graham* analysis is resisting and obstructing, which under the circumstances weighed in favor of an intermediate use of force.

The second and third *Graham* factors ask whether the suspect posed an immediate threat to the safety of the officers or others, and whether the suspect was actively resisting arrest. As the situation escalated in this case, both of the above factors came into play. After Plaintiff was openly hostile toward Deputy McAvoy and began pacing around his driveway in an agitated manner, the Deputy expressly told Plaintiff that the Deputy did not feel safe and that Plaintiff should return to his car while the Deputy ran Plaintiff's information. Plaintiff's openly hostile attitude and his ability to go into the open garage or his house (both of which could contain a weapon) created a dangerous situation for Deputy McAvoy. Similarly, when Deputy Dunkin arrived on the scene and both officers were attempting to secure Plaintiff in handcuffs, it is undisputed that Plaintiff actively resisted the officers' efforts and in fact did succeed in escaping from their control.

When Plaintiff struggled out of the grasp of the Deputies and fled into his garage, under the totality of the circumstances, it was reasonable for Deputy Dunkin to deploy his taser in dart mode to stop Plaintiff from entering his house and to bring Plaintiff back under the Deputies' control. In other words, the initial use of the taser in dart mode was

**ORDER - 15**

not excessive.[6] This finding, however, does not end the analysis.

Notwithstanding Defendants' claims to the contrary, a significant factual dispute exists as to what happened after Deputy Dunkin deployed his taser in dart mode. The Deputies claim that the taser did not have its intended effect and that, after being struck with the taser darts, Plaintiff continued to move toward the door leading into his house. (*Aff. Of Dunkin* ¶ 13, Dkt. 35-3.) According to the Deputies, Plaintiff reached the door where he fell to the ground and, as the Deputies attempted to restrain him, Plaintiff continued to struggle. (*Id.* ¶ 14.) At that point, Deputy Dunkin states in his affidavit that he "then activated [his] taser in drive-stun mode and made direct contact with Wise's lower back and left leg while he was still attempting to pull away . . . [and] I continued to deploy the taser as Wise actively ignored our commands and continued to resist arrest." (*Id.* ¶¶ 14, 15.)

Plaintiff's version of the above facts differs significantly. In his affidavit, Plaintiff indicates that "when the taser dart hit me, I was knocked to the ground and I was laying on my back in severe pain and incapacitation while the taser was cycled at least twice."

---

[6] In his Response, Plaintiff asserts that, while the Deputies were attempting to restrain him the first time (before the taser was deployed in either mode), one of the Deputies grabbed Plaintiff's thumb resulting in serious and permanent injury. Plaintiff has submitted no evidence substantiating any alleged injury. Moreover, the Court considers the force employed in grabbing Plaintiff's thumb no greater in magnitude than the use of the taser in dart mode. Thus, for the same reasons the Court finds the use of the taser in dart mode reasonable under the *Graham* factors, the Court also finds the use of physical restraint (including the grabbing of Plaintiff's thumb) reasonable under the Fourth Amendment.

(*Aff. Of Wise* ¶ 4, Dkt. 40-1.) Plaintiff further states that, while he was incapacitated, he recalls being tased in drive-stun mode at least four times. (*Id.*)

On a motion for summary judgment the Court is required to take the facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Taking Plaintiff's version of the facts as true, after Deputy Dunkin deployed his taser in dart mode, Plaintiff was incapacitated, he no longer posed a threat to the Deputies, and he was no longer resisting arrest. Under this version of the facts, the *Graham* factors weigh in favor of Plaintiff's contention that the use of force applied *after* Deputy Dunkin deployed his taser in dart mode was excessive.

Based on the above discussion, the Court finds that, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that the multiple applications of the taser in drive-stun mode after Plaintiff was rendered incapacitated by Deputy Dunkin's use of the taser in dart mode was unreasonable under the totality of the circumstances, i.e., it was excessive for the purposes of the Fourth Amendment.

**B.    Clearly Established Law**

Having concluded that Plaintiff has sufficiently alleged disputed facts supporting a constitutional violation, the next step in the qualified immunity analysis is whether the constitutional right was clearly established at the time of the conduct. At this step, the Court asks whether the contours of the right at issue were "'sufficiently clear' that every 'reasonable official would have understood that what he was doing violates that right.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483

U.S. 635, 640 (1987)). Defendants argue that, assuming the Court finds a constitutional violation, the "Deputies are still entitled to qualified immunity as it would not have been clear to any reasonable officer on October 19, 2009, that the use of a taser in the situation they confronted was unconstitutional." (Dkt. 35-1 at 20.) On this point, Plaintiff provides no assistance to the Court. Indeed, after briefly discussing the Ninth Circuit's en banc decision in the *Brooks/Mattos* case, Plaintiff's brief states the following

> [The Ninth Circuit] concluded that both Mattos and Brooks had alleged facts wherein a reasonable jury could find that excessive force had been used. However, neither Plaintiff prevailed because both sets of officers were granted Qualified Immunity, since no other Circuit Court of Appeals until that point had ruled that tasering amounts to excessive force under the Fourth Amendment. *That is not the situation this court finds itself in now. At the time that Plaintiff was arrested and tased*

(*Pl.'s Mem. In Opposition to Summ. J.* at 2, Dkt. 40) (emphasis added). If the above quotation appears incomplete, that is because it is. The Court did not omit anything. No punctuation mark follows the word "tased" and Plaintiff's brief simply moves on to the next paragraph. Plaintiff has left the Court with a cliff hanger, leaving the Court wondering what the situation was "At the time that Plaintiff was arrested and tased[.]" Presumably, Plaintiff intended on illuminating the Court about the legal landscape at the time of the incident in this case (October 19, 2009) with a case or two decided prior to that date putting the Deputies on notice that the use of force involved in this case was excessive. Plaintiff, however, provided the Court with nothing.

**ORDER - 18**

After conducting its own search of the case law, the Court was unable to find any cases that would act as clearly established law on this issue for the purposes of the qualified immunity analysis. The Court did find one unpublished opinion from the Ninth Circuit Court of Appeals stating that "it was not clearly established at the time of [the plaintiff's arrest on February 7, 2008] that use of four, five-second Taser cycles within a span of approximately two minutes against a suspect who appeared unarmed, fell to the ground following the first tasing and thereafter presented no real threat of escape, and was surrounded by three officers, was objectively unreasonable." *Abston v. City of Merced*, 2013 WL 364214 (9th Cir. 2013). According to the above quoted case, the right asserted by Mr. Wise was not established as of February of 2008. That does not conclusively end the debate because Plaintiff's arrest did not occur until October of 2009, so a case could have been decided after February of 2008, but before Plaintiff's arrest establishing the right. Plaintiff, however, has not directed the Court to such a case and the Court was not able to find one through its own research. The Court also specifically asked Plaintiff's counsel at the hearing whether any case existed establishing the alleged constitutional violation. Plaintiff's counsel stated that he was not aware of any such case.

Applying the applicable case law to the facts of this case, the Court concludes that, as of October 19, 2009, a reasonable officer would not have known that the use of a taser in the situation confronted by Deputies McAvoy and Dunkin was unconstitutional. The Deputies are therefore entitled to qualified immunity.

**ORDER - 19**

3.       **Municipal Liability**

In his Amended Complaint, Plaintiff names Kootenai County Sheriff Rocky

Watson and the County itself as defendants. The Complaint alleges that "Defendants

commenced to implement a policy, custom, usage or practice wherein the rights,

privileges or immunities of the Plaintiff were violated." (*Pl.'s Amended Compl.* ¶ 17, Dkt.

22.)  The Complaint also alleges that Defendants "acted pursuant to the polciies,

regulations, failure to develop a policy which would have prevented rogue behavior, and

decisions officially adopted or promulgated by those persons whose acts may fairly be

said to represent official policy of or were pursuant to a governmental custom, usage or

practice of the Defendants." (*Id.* ¶ 19.)

The United States Supreme Court held in *Monell v. Department of Social Services*

*of City of New York*, 436 U.S. 658 (1978), that "local governing bodies . . . can be sued

directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action

that is alleged to be unconstitutional implements or executes a policy, statement,

ordinance, regulation, or decisions officially adopted and promulgated by that body's

officers." *Id.*, at 690. Proof of a single incident standing alone cannot sustain a finding of

municipal or local governmental liability under Section 1983, unless there is proof that

the incident was caused by an existing unconstitutional policy. *City of Oklahoma City v.*

*Tuttle*, 471 U.S. 808, 823-24 (1985). "Where a plaintiff claims that the municipality has

not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous

standards of culpability and causation must be applied to insure that the municipality is

**ORDER - 20**

not held liable solely for the actions of its employees." *Board of County Commissioners of Bryan County, Okl. v. Brown*, 520 U.S. 397, 405 (1997).

Defendants argue that Plaintiff has supplied the Court with evidence of one incident only and that Plaintiff has not sustained the allegations of unconstitutional policies contained in his complaint with evidentiary support. The Court agrees. The only materials provided to the Court in support of Plaintiff's opposition to Defendants' motion for summary judgment was the five paragraph affidavit supplied by the Plaintiff himself. No materials were submitted in support of Plaintiff's *Monell* claim and Plaintiff failed to brief the issue in his opposition. Not surprisingly, Plaintiff withdrew the *Monell* claim at the hearing on Defendants' motion. Based on the above, the Court will grant Defendants' motion for summary judgment on this issue.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Defendants' Motion for Summary Judgment (Dkt. 35) is **GRANTED** and Plaintiff's Amended Complaint is hereby dismissed in its entirety with prejudice.



DATED: April 26, 2013

_____
Honorable Candy W. Dale
Chief United States Magistrate Judge

**ORDER - 21**